## Davis v. Commonwealth.

(Decided October 10, 1924.)

## Appeal from Martin Circuit Court.

1.  Homicide—Reckless Handling of Gun Causing Death of Another May be Voluntary Manslaughter.—One handling a gun in grossly reckless manner so as to result in death of another may be guilty of voluntary manslaughter, as where one oiling a gun points it at another and snaps it without having satisfied himself that it is unloaded.

2.  Homicide—Evidence Held Not to Warrant Conviction for Voluntary Manslaughter.—Evidence held not to show grossly reckless handling of automatic pistol which would warrant conviction for voluntary manslaughter.

3.  Criminal Law—Statement by Deceased that Defendant "Aimed to" Shoot Her Held Not Substantive Evidence.—Statement made in presence of accused by deceased that defendant "aimed to" shoot her was a mere conclusion and not substantive evidence; defendant claiming that shooting was accidental.

4.  Criminal Law—Conviction can Rest Only upon Legally Competent Evidence having Probative Force.—Conviction may rest only upon legally competent evidence having probative force and tending to inspire conviction.

J. B. CLARK for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant, Roy Davis, was indicted by the grand jury of Martin county, in which he was accused of murdering Irene Starr, a little girl between four and five years of age. Upon his trial he was convicted of voluntary manslaughter and sentenced to confinement in the penitentiary for a term of two years. His motion for a new trial was overruled and he appeals from the judgment pronounced on the verdict.

A number of supposed errors are relied on in the motion for a new trial, but we find none of them possessing merit except those herein referred to.

The undisputed facts are, that appellant was nineteen years of age in the latter part of December, 1922, when the little Starr girl was shot at about six o'clock p. m. in a room of the residence of appellant's stepfather, with whom he was living. Some time prior to that he had

purchased or traded for an automatic pistol, and he concluded to take it to pieces and oil it, and accordingly he took out the magazine and other parts in order to do the oiling. He says that he intended to and thought he had also taken out the cartridge that in all probabiltty was in the barrel. The deceased lived with her father and mother some one hundred yards from the residence of appellant's stepfather, and the latter also had some small children whom the deceased frequently visited and they all played together in and around the dwelling house, and on the fatal evening they were occasionally passing through the house, including the room wherein appellant was oiling his pistol. After the oiling the defendant, as he states and which is disputed by no one, was engaged in assembling the parts of the pistol when he says it accidentally fired and the bullet struck the little girl, inflicting a wound from which she died about three o'clock the next morning. Immediately, appellant's mother, who was in the kitchen adjoining the room where the accident happened, ran in and picked up the wounded girl and started with her to her father's house, and appellant went to the commissary store to notify her father, and the two went to the Starr home, where the deceased had been carried and was lying on the bed. Others were in the room at the time, and the father, in giving his testimony, was asked and answered: "While you were present, did she say in your presence and in the presence of the defendant, anything about who shot her? A. Yes, she looked over at him and says, 'papa,' said 'Roy, you shot me,' and I said, 'He didn't aim to, honey,' and she said, 'Yes, he did, papa,' " Jarred Waller, who was present at the time, was asked and answered: "Were you there when the little girl told who shot her? A. Yes, I was there. Q. And Roy Davis was there? A. Yes, I think Roy was there. Q. Tell the jury what she said? A. Well, she said Roy Davis shot her. Q. What did Roy say? A. Her father said, 'He didn't aim to,' and she said, 'Yes, he did.' Q. What did Roy say? A. I don't think Roy said a word." Objections and exceptions were made and reserved to the testimony of both of those witnesses, who also stated that what we have inserted was all that was said on that occasion, and that evidence was all that was introduced to sustain a manslaughter conviction.

On the other hand, defendant testified that he did not know that the little girl was in the room at the time the

pistol fired and, hence, that he did not point the pistol at her, nor did he at any time intend to pull the trigger or to do any other act that would cause it to fire, and that its shooting on the occasion was wholly unintentional and purely accidental. It is shown that he was considerably grieved and that he had always been kind and considerate toward the deceased and that he harbored no feeling of any kind against her or any member of her family. Furthermore, it appears that he was a hardworking boy and bore an excellent reputation in the community. He immediately raised the alarm and went to and did notify the father, and the entire record is completely barren of any motive for any intentional shooting. It is possible for such a shooting to occur in such a grossly reckless manner as to render the responsible party guilty of voluntary manslaughter, as is shown in the opinions in the cases of Davis v. Commonwealth, 193 Ky. 597; Speaks v. Same, 149 Ky. 393; Peay v. Same, 181 Ky. 396, and a great many other cases from this court found in note 19, subdivision (e), 29 C. J. 1156; and, if it had been shown in this case, or if there had been evidence sufficient to authorize the jury to so find, that defendant without satisfying himself that there was no cartridge left in the barrel of the pistol and under those circumstances he intentionally pointed the pistol at the deceased and snapped it, then the killing would necessarily have been voluntary manslaughter under the opinions referred to, although he had no intention to fire the pistol or injure her, for it would have exhibited such gross and reckless conduct, as well as indifference to the safety of others, as to bring the homicide within the rule announced in those cases.

We have, however, no such case in the record. The testimony of appellant shows only a purely accidental shooting, unless, perhaps, his handling of the pistol in the manner he did at a time when children were playing around and about him produced a sufficiently negligent handling of it as to make the shooting *involuntary* manslaughter instead of *voluntary* manslaughter. But there seems to be an absence of evidence to produce a necessary element of involuntary manslaughter, since there is no evidence that the deceased or the other children were playing around or about defendant at the time he was working with the pistol, and that the presence of the deceased was due to her casually passing through the room at the unfortunate moment. The cases referred to clearly

point out the distinction between the character of negligence and recklessness separating the degree of homicide as to voluntary and involuntary manslaughter, and it will be unnecessary to repeat that distinction in this opinion. Suffice it to say that there is no proof in this record of the handling of the pistol by defendant on the occasion in question in such a careless manner as to indicate a reckless indifference to the safety of others; nor do we find therein anything testified to by defendant (and he was the only witness as to what occurred at the time) to show sufficient carelessness to create voluntary manslaughter, unless, as is contended by the Commonwealth, that the statement of the little girl, which is the only basis for such a contention, was sufficient to support the conviction.

In the first place, we entertain grave doubt as to the admissibility of that testimony. It is of the classification in criminal evidence known as "admissions by silence," and it arises when an accusatory statement is made in the presence and hearing of the defendant under such circumstances as require from him a response and he either remains silent or makes a guilty response. The books say that the probative effect of absolute silence on the part of the defendant, even when the circumstances call upon him to answer, is of slight weight, and is to be received with caution. 16 C. J. 631-2. On the latter page it is also said: "For the silence of accused to be competent evidence against him, or at least to be entitled to weight, as an admission of the truthfulness of statements of others made to him or in his presence, the circumstances and statements must have been such as naturally and reasonably to call for a reply by him; and it also must appear affirmatively that he had an opportunity or right under the circumstances of the case to deny the truthfulness of the charges made against him." The text appears to embody the general rule with reference to the admissibility and weight of such testimony, and we repeat that, measuring the statement of the deceased by that rule, it is extremely doubtful if it was competent. It will be noted that neither of the witnesses as to that statement testified as to the relative location of defendant to the deceased at the time so that it might be inferred that he heard it, and we might here state that he denied having heard it. He was scarcely more than a boy in age at the time, and everybody was necessarily excited as well as grieved, and we doubt, even if the statement had

been heard by him, that it was made under such circumstances as that he felt he was called upon to make a response. He, no doubt, had previously told the father how it had happened, as well as his mother, and naturally he would not wish to engage in a discussion, or to take issue with, the little girl under such circumstances and with whom he was no doubt in deep sympathy.

But, brushing those matters aside, we observe that the literal statement was that defendant had shot the deceased and that he "aimed to." The fact that he shot her was and is admitted, but what the little girl meant by the phrase "he aimed to" is susceptible of various interpretations. We have held on a number of occasions that statements made under similar circumstances, and in dying declarations, to the effect that "he shot me for nothing" are inadfissible as substantive proof because expressive only of a conclusion of the speaker. It is difficult for us to draw a distinction between that class of cases and that presented by this record, since we cannot escape the conviction that the statement of the deceased was nothing but her conclusion. Philpot v. Commonwealth, 195 Ky. 555. If she had stated any fact indicating intentional or grossly reckless shooting and from which the jury would be authorized to find that it was so, we would have an entirely different case. She may have observed the barrel of the pistol pointed in her direction and its subsequent firing produced in her mind the belief that the defendant intended to and purposely did shoot her, and her statement was but an expression of such conclusion.

All criminal laws should be strictly enforced to the end that society may be protected and the people live in peace and safety; but, notwithstanding the urgent necessity of such enforcement, it is not the policy of the law to convict one except upon legally competent evidence having probative force and tending to inspire conviction, since it is also its policy that the innocent shall not be punished. For the accomplishment of those purposes certain rules for the investigation of criminal charges have been long since promulgated and found to be safe and reliable for the protection of the rights of both the prosecutor and the prosecuted. It is, therefore, the bounden duty of courts to follow those rules as best they can rather than to depart from them in a deplorable case, as this evidently is. A case in its essential features almost exactly analogous to this one is the Peay case, *supra,* which but fol-

lows a number of others preceding it, and which we think is conclusive of this one.

Wherefore, the judgment is reversed with directions to grant the new trial and for proceedings consistent herewith.